Fount Standifer v. The ' State.

No. 5370.   Decided June 4, 1919.

**Murder—Manslaughter—Evidence—Undisclosed Motive.**

Upon trial of murder, and a conviction of manslaughter, it was re-
versible error to admit testimony of the wife of the deceased, that after
having an altercation with the defendant, some time before the homicide, the
deceased had left the premises and in a conversation between deceased and
his wife said that he would go to the post-office and then meet her at the
restaurant. where the homicide occurred, in order to explain his presence
there, this undisclosed intent, attributed to the deceased, not being known
to the defendant.   Following Adams v. State, 44 Texas Crim. Rep., 66, and
other cases.

Appeal from the District Court of Milam; Tried below before the
Hon. John Watson.

Appeal from a conviction of manslaughter; penalty, two years
imprisonment in the penitentiary.

The .opinion states the case.

R. Lyes, for appellant.—Cited Ball v. State, 29 Texas Crim. App.,
107, and cases cited in the opinion.

E. A. Berry, Assistant Attorney General, for the State.

MORROW, Judge.—Under an indictment for murder appellant was
convicted of manslaughter.

He shot and killed Ben Johnson. Both parties were negroes. The
homicide took place in the village of Gause. The difficulty begun on
a gallery in front of a restaurant kept by a negro named Perry.
The adjoining house belonged to Mrs. Rhodes.   It had been oc-
cupied by deceased and used for a restaurant, but a short time
before the homicide she had leased it to appellant, who intended
to use it for a like purpose.   There is evidence that the deceased
was opposed to the use of the premises by the appellant, and that
he had on several occasions expressed his intention to kill the ap-
pellant in the event he did occupy Mrs. Rhodes' premises, some of
these threats having been made in the presence of appellant, and
others communicated to him.   One witness testified that a very short
time before the homicide he met deceased who told witness that he
had been mistreated, and that he was going to kill the appellant
before sundown; that later he met the appellant and communicated
to him this fact, and advised him not to go about the premises.   Ap-
pellant testified that he had refrained from opening the restaurant
in the building that he had rented from Mrs. Rhodes on advice
from her, awaiting the departure of the deceased and fearing injury
from him; that he had put some property belonging to his uncle in
the building; that the deceased's wife had obtained a note for $20
against him, which note belonged to a man by the name of Williams,

and had insisted upon its payment on the day of the homicide, and
that he had notice of a fire about his premises and had gone to investi-
gate its cause, and met the deceased who upbraided him about not pay-
ing the note, and told him if he did not do so he would kill him, and
that at that time he made an assault upon him, kicking his shins
and exhibiting a pistol; that he called upon Mr. Rhodes, a white man,
who interfered, and he then went to his home and got his pistol, and
on his route back to town received the information that the deceased had
said he was going to kill him before sundown; that at
the request of his uncle he went to the building which he had rented
· to permit the property belonging to his uncle to be removed.  He
said: "I walked on up on the restaurant gallery and deceased run
around behind me and I whirled around and pulled my gun on
him, because he had been threatening my life, knowing he would
injure me if he could.  He run under me like and I struck at him
with the gun and the gun went off."  A struggle followed and the
parties went into Perry's restaurant.   Appellant said they both
fell to their knees, and that Mary Johnson, the wife of deceased,
joined in the affray, using a knife, and that in the struggle the
deceased appeared ·to be trying to get something from his clothing;
that during the struggle appellant jerked loose and fired at deceased,
who ran to the back door, and appellant thinking deceased was
trying to get his gun followed him and fired again.   There was
evidence that the appellant's uncle and wife also engaged in the
affray after it begun and while they were in the restaurant.   The
deceased received two gun shot wounds; one of them fatal.

Appellant's theory was that the deceased had come to the pre-
mises for the purpose of carrying his threats into execution.   The
State · explained his presence at the place of the difficulty by the
testimony of his wife, upon the admissibility of which there arises
one of· the legal questions presented by a bill of exceptions, and
is, in substance, that she testified that after having an altercation
with the appellant some time before the fatal encounter on the
same day, the deceased had left the premises, and that he and witness
were ready and preparing to go to their home when the deceased
remarked that he had not mailed his letters, and she told him to go
by the postoffice and mail his letters and meet her at the restaurant.
That he went to the postoffice, and she went to Perry's restaurant
where he had told her to wait and had said that he would come straight
there, and they would go home together.   Appellant insists that
he having no knowledge of this conversation, or the intent which
is attributed to the deceased, and that the actions of the appellant
were governed by the information in his possession, that there was
error prejudicial to him in admitting in evidence the undisclosed
motive of the deceased.   The same question of law arose in the case
of Adams v. State, 44 Texas Crim. Rep., 66, in which the presence
of the deceased at the place of the homicide was explained by evi-

dence that he was in the habit of making visits to his father, and that he was at the time on such a journey. The court held its admission erroneous, quoting Johnson v. State, 22 Texas Crim. App., 222, in which case exception was reserved to the admission of testimony "that deceased was going on the next day to make up a party at Grade Smith's on Monday night." The court said: "Obviously the purpose of this testimony was to show that deceased was entertaining no deadly purpose or intent when he went to Caddo Mills, the place of the homicide, and that he did not go there to carry out the threats he had previously made against defendant's life We are of opinion the evidence was inadmissible, it being hearsay so far as defendant was concerned, and as such it was not binding upon him. . . . It is a maxim of the law that a man is only bound so far as matters reasonably appear to him; he cannot be bound by motives locked up and hidden in the breasts of others. Deceased's undisclosed and undiscovered motives in going to Caddo Mills was not a material issue, and could throw no light whatever upon the guilt or innocence of defendant, whose motives alone were the important issue to be tried." This principle has been applied in a number of instances, among them, Pratt v. State, 53 Texas Crim. Rep., 289; Gray v. State, 47 Texas Crim. Rep., 378; Burnett v. State, 46 Texas Crim. Rep., 119; Clay v. State, 44 Texas Crim. Rep., 137; Nelson v. State, 58 S. W. Rep., 108; Stell v. State, 58 S. W. Rep., 76; Fuller v. State, 30 Texas Crim. App., 559. We think its application in the instant case is obvious. The appellant in going to his property, on discovering deceased running behind him and preparing to attack him, would most naturally attribute his presence and conduct as an intent to carry into execution the threats that he had made to kill the appellant. He had no knowledge that the deceased had made an appointment to meet his wife at that time and place, and had no knowledge that it was the deceased's intention to go peacefully home with his wife and abandon any intention to injure the appellant. In the absence of such knowledge, these motives, if the deceased had them, could not be considered against the appellant. The admission of them in evidence, over his objection, invited the jury to consider them against him. This was antagonistic to the law of self-defense, which requires that the jury shall view the matter from the standpoint of the accused, and this they cannot do if they consider against him those facts of which he had no knowledge.

As presented we discover no error in the matters touched in the other bills of exception.

For the error mentioned the judgment is reversed and the cause remanded.

*Reversed and remanded.*